803 P.2d 978 (1990)
119 Idaho 978
HOUGHLAND FARMS, INC., Plaintiff-Respondent,
v.
Phillip JOHNSON, d/b/a Anchor Financial Services, Defendant-Appellant.
No. 18406.
Supreme Court of Idaho, Idaho Falls, September 1990 Term.
December 27, 1990.
Johnson, Olson & Bacon, Pocatello, for defendant-appellant. Scott L. Burnham argued, Pocatello.
Whittier, McDougall, Souza, Murray & Clark, Chartered, Pocatello, for plaintiff-respondent. R. Max Whittier argued, Pocatello.
JOHNSON, Justice.
This is a breach of contract case that also raises issues concerning personal jurisdiction under our long-arm statute, I.C. § 5-514(a) (1990), and under the due process clause of the fourteenth amendment to the United States Constitution. We conclude that the trial court should have granted a motion to dismiss for lack of *979 personal jurisdiction. In doing so, we find it necessary to overrule Beco Corp. v. Roberts & Sons Constr. Co., 114 Idaho 704, 760 P.2d 1120 (1988), to the extent that it conflicts with Burger King Corp. v. Rudzewicz, 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985).

I.

THE BACKGROUND AND PRIOR PROCEEDINGS.
Phillip W. Johnson was a loan broker who resided in Salt Lake City, Utah and did business as Anchor Financial Services. Houghland Farms, Inc. (HFI) was an Idaho corporation. HFI owned an ice manufacturing plant in Arizona known as Diamond Mine Ice. HFI also operated farms in Idaho. Porter Houghland (Houghland) was the president of HFI and resided in Arizona.
In October 1987, Johnson wrote a letter from Utah to Houghland in Arizona, stating that Johnson had several lenders in Colorado who would be interested in refinancing $1,500,000.00 which HFI owed for the purchase of Diamond Mine Ice. In November 1987, Johnson visited Arizona to inspect the assets of Diamond Mine Ice. These assets were the proposed collateral for the refinancing. Shortly thereafter, Johnson called representatives of HFI in Idaho by telephone to arrange a visit to farms of HFI in Idaho. In December 1987, Johnson visited one of HFI's farms in Idaho and then sent a letter to representatives of HFI in Idaho. The letter concluded: "I look forward to formally submitting your loan request as soon as I receive the October 31, 1987 year end financial statement." Johnson also contacted various Idaho banks to procure statistical information regarding HFI.
In December 1987, Johnson sent a loan proposal to Houghland in Arizona. This proposal provided for a loan of $1,200,000.00 to HFI from a Colorado lender, with Houghland and his wife as guarantors. The collateral for the loan was a first mortgage on the assets of Diamond Mine Ice in Arizona. HFI had purchased these assets for $1,750,000.00. The loan was to be limited to sixty-nine percent of the value of the collateral. The proposal stated that the lender might require an appraisal of the collateral prior to funding. Johnson was to receive a one and one-half percent broker's fee at the time of closing, from which he was to pay a fee to Financial Management Group of Boise, Idaho. HFI was to pay Johnson $9,000.00 from the broker's fee at the time of HFI's acceptance of the proposal. The proposal stated: "This fee is refundable if the lender does not approve and fund the loan. If the lender approves the loan under the terms above and the transaction does not close through no fault of lender, the fee shall be considered earned." Houghland signed the loan proposal on behalf of HFI and sent Johnson a check for $9,000.00 drawn on HFI's account in an Idaho bank.
An appraisal determined the value of the assets of Diamond Mine Ice to be only $750,000.00. Consequently, the lender was not willing to loan the proposed $1,200,000.00. Houghland and Johnson then agreed that attempts should be made to see if there was a possibility of "bifurcating the loans." Johnson arranged a loan of $525,000.00 from the lender, but HFI obtained financing elsewhere.
Houghland then requested the return of the $9,000.00 advance that HFI had paid toward the broker's fee. Johnson sent HFI a check for $9,000.00 drawn on a Utah bank but stopped payment on the check before HFI cashed it. Johnson then refused to return the $9,000.00 to HFI.
HFI filed this action in Idaho seeking the return of the $9,000.00, plus interest, attorney fees, costs, and additional damages under the Idaho law regulating loan brokers, I.C. § 26-2504 (1990). Johnson was apparently served in Utah and moved to dismiss the action for lack of personal jurisdiction. The parties supported and opposed the motion with affidavits. Although the trial court offered the parties the opportunity to have an evidentiary hearing, neither party requested one, and the motion was considered solely on the basis of the affidavits.
*980 The trial court denied the motion to dismiss on the grounds that Johnson had purposefully directed his activities at residents of Idaho and that the litigation resulted from alleged injuries that arose out of or related to those activities, thus meeting the fair warning requirement to provide Johnson with due process of law.
HFI then moved for summary judgment on its claims against Johnson. The trial court granted summary judgment to HFI for $9,000.00, plus costs, attorney fees, and interest. In doing so, the trial court rejected Johnson's contention that there were genuine issues of material fact concerning whether the parties had orally modified the loan proposal to provide Johnson a $525,000.00 loan, rather than the $1,200,000.00 contemplated in the loan proposal. The trial court also concluded that the Idaho law regulating loan brokers did not apply, because the written agreement for a broker's commission was formed outside of Idaho.
Johnson appealed, challenging the denial of the motion to dismiss, the grant of summary judgment, and the award of attorney fees to HFI.

II.

APPLYING BECO CORP. V. ROBERTS & SONS, THE TRIAL COURT PROPERLY DENIED THE MOTION TO DISMISS.
Johnson asserts that the trial court should have granted the motion to dismiss on the grounds that Johnson's contacts with Idaho were too brief and insignificant to fall within the Idaho long-arm statute or to meet constitutional due process requirements. We first consider the propriety of the denial of the motion to dismiss by applying our decision in Beco Corp. v. Roberts & Sons. Viewing the affidavits presented here in the light most favorable to HFI, construing the facts asserted in the affidavits liberally in favor of HFI, and applying Beco, there was not a sufficient basis to dismiss the action for lack of personal jurisdiction.
We note in passing that although the record does not contain either a return of service or an allegation indicating that Johnson was served outside of the state of Idaho, neither party has addressed this question. By implication, we are asked to assume that Johnson was served outside this state. If Johnson had been served in Idaho, the courts of this state would have had personal jurisdiction over Johnson. Burnham v. Superior Court of California, ___ U.S. ___, ___, 110 S.Ct. 2105, 2115, 109 L.Ed.2d 631, 645 (1990) (jurisdiction based on physical presence alone constitutes due process). Because this issue was not presented to the trial court, we do not rule on it here.
Before embarking on an analysis of the trial court's denial of the motion to dismiss, we restate the standard by which we review the trial court's decision. In Intermountain Business Forms, Inc. v. Shepard Business Forms Co., 96 Idaho 538, 531 P.2d 1183 (1975), this Court set forth the "evidentiary presumptions" that "should apply to appellate review of the factual questions presented by the conflicting affidavits in a motion to dismiss for lack of personal jurisdiction." Id. at 540, 531 P.2d at 1185. In Intermountain Business Forms, this Court applied the same standard for appellate review as the standard used in reviewing an involuntary dismissal at the close of plaintiff's proof in a jury case, and the standard used in reviewing an order granting summary judgment:
On appellate review of involuntary dismissal at the close of plaintiff's proof in a jury case, this court has held that the evidence introduced must be viewed "in the light most favorable to the plaintiffs, and the plaintiffs are entitled to all reasonable inferences which can be drawn from facts established by their case in chief. Blackburn v. Boise School Bus Co., 95 Idaho 323, 325, 508 P.2d 553, 555 (1973).
* * * On appeal from an order granting summary judgment, this court must construe the evidence presented to the district court liberally in favor of the party opposing the order and accord [that party] `the benefit of all inferences *981 which might be reasonably drawn.'" Straley v. Idaho Nuclear Corp., 94 Idaho 917, 918, 500 P.2d 218, 220 (1972). Accord, Fairchild v. Olsen, 96 Idaho 338, 528 P.2d 900 (1974).
These same presumptions should apply to appellate review of the factual questions presented by the conflicting affidavits in a motion to dismiss for lack of personal jurisdiction.
Id.
In order to apply this standard of review to the denial of the motion to dismiss, we must first identify the legal basis for the assertion of personal jurisdiction over Johnson in this action. Our long-arm statute provides:
5-514. Acts subjecting persons to jurisdiction of courts of state.  Any person, firm, company, association or corporation, whether or not a citizen or resident of this state, who in person or through an agent does any of the acts hereinafter enumerated, thereby submits said person, firm, company, association or corporation, and if an individual, his personal representative, to the jurisdiction of the courts of this state as to any cause of action arising from the doing of any of said acts:
(a) The transaction of any business within this state which is hereby defined as the doing of any act for the purpose of realizing pecuniary benefit or accomplishing or attempting to accomplish, transact or enhance the business purpose or objective or any part thereof of such person, firm, company, association or corporation; ... .
I.C. § 5-514(a) (1990).
The exercise of personal jurisdiction by the courts of this state over those who do any of the acts enumerated in I.C. § 5-514 extends only "as to any cause of action arising from the doing of any of said acts." This is "specific" as distinguished from "general" jurisdiction.
It has been said that when a State exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum, the State is exercising "specific jurisdiction" over the defendant.
When a state exercises personal jurisdiction over a defendant in a suit not arising out of or related to the defendant's contacts with the forum, the State has been said to be exercising "general jurisdiction" over the defendant.
Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414, nn. 8 & 9, 104 S.Ct. 1868, 1872, nn. 8 & 9, 80 L.Ed.2d 404, 411, nn. 8 & 9 (1984) (citations omitted).
In analyzing whether there are sufficient contacts for the exercise of specific personal jurisdiction, we must remember that the suit for which jurisdiction is sought must arise out of or relate to the defendant's contacts with Idaho. It is not just any contacts by the defendant with Idaho that will sustain the exercise of specific personal jurisdiction, but only those out of which the suit arises or those that relate to the suit.
In Beco, this Court considered a case in which an exercise of specific jurisdiction under the authority of I.C. § 5-514(a) was challenged. In upholding the exercise of personal jurisdiction over the defendant in Beco, the Court stated the rules that apply to the exercise of personal jurisdiction by Idaho under I.C. § 5-514(a):
The question of the existence of personal jurisdiction over a nonresident defendant is one of law which we review freely.
... .
The legislation is designed to provide a forum for Idaho residents, and, as remedial legislation of the most fundamental nature, is to be liberally construed... .
The statute itself defines "transaction of any business within this state" as "the doing of any act for the purpose of realizing pecuniary benefit." . ..
... Since the legislature in adopting I.C. § 5-514 intended to exercise all the jurisdiction available to the State of Idaho under the due process clause of the United States Constitution, we must turn to our federal cases for guidance while bearing in mind that the minimum contacts test is not susceptible of mechanical *982 application and each case requires an ad hoc analysis of the jurisdictional facts.
The leading case involving a contract dispute is the recent Burger King Corp. v. Rudzewicz, 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)... .
Reviewing prior cases, Justice Brennan reasoned that the minimum contacts required by International Shoe v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), are supplied if the defendant "purposefully directs" his activities at residents of the forum state and the litigation arises out of or relates to those activities. Id. 105 S.Ct. at 2182. In contracts cases, those who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to suit in the other state for the consequences of their activities. Id.

If minimum contacts exist, the analysis takes one further step:
Once it had been decided that a defendant purposefully established minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with "fair play and substantial justice." Thus courts in "appropriate case[s]" may evaluate "the burden on the defendant," "the forum State's interest in adjudicating the dispute," "the plaintiff's interest in obtaining convenient and effective relief," "the interstate judicial system's interest in obtaining the most efficient resolution of controversies," and the "shared interest of the several States in furthering fundamental substantive social societies." These considerations sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required... . On the other hand, where a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable. Burger King, [105 S.Ct.], at 2184-2185. (citations omitted).
114 Idaho at 706-08, 760 P.2d at 1122-24 (citations omitted) (emphasis added).
In Beco, the appeal was taken from the denial of defendant's motion to dismiss for lack of personal jurisdiction made during the jury trial at the conclusion of plaintiff's case-in-chief, and from the denial of defendant's motion for judgment n.o.v., as it related to the exercise of personal jurisdiction over the defendant. The motion to dismiss was indistinguishable in operation and effect from a motion for directed verdict.
In considering a motion for directed verdict, the trial court is to accept the truth of the adverse evidence and every inference that may legitimately be drawn from the adverse evidence in the light most favorable to the nonmoving party. The motion should not be granted if the evidence is of sufficient quantity and probative value that reasonable minds could conclude that a verdict in favor of the nonmoving party would be proper. Stephens v. Stearns, 106 Idaho 249, 252-53, 678 P.2d 41, 44-45 (1984). The standard for considering a motion for judgment n.o.v. is the same as that for a motion for directed verdict. Quick v. Crane, 111 Idaho 759, 763, 727 P.2d 1187, 1191 (1986). This is also substantially the same standard laid down in Intermountain Business Forms for considering a motion to dismiss for lack of personal jurisdiction, where the motion is presented on affidavits. Therefore, the appellate standard applied by the Court in Beco is the same standard of review that we should apply in this case.
In upholding the rulings of the trial court in Beco, this Court first concluded that the activities of the defendant constituted "the doing of any act for the purpose of realizing pecuniary benefit," as required by I.C. § 5-514(a). 114 Idaho at 707, 760 P.2d at 1121. In doing so, the Court focused on these facts:
1. The defendant asked the plaintiff if the plaintiff wanted to work as a subcontractor *983 on a job the defendant had in Arizona.
2. The defendant, while in Utah, negotiated the subcontract in phone conversations with the plaintiff, who was in Idaho.
3. The plaintiff drafted and signed the subcontract in Idaho and mailed it to the defendant in Utah.
4. The defendant signed the contract and mailed it back to the plaintiff in Idaho.
5. The plaintiff commenced performance of the subcontract in Arizona but left the job because of the muddy condition of the job site.
6. The plaintiff failed to complete the work called for under the subcontract.
7. The defendant contacted the plaintiff in Idaho to determine when, or if, the plaintiff intended to return to Arizona to complete the work.
8. The defendant notified the plaintiff by a telegram sent to the plaintiff in Idaho that unless arrangements for the plaintiff's return to the job site in Arizona were made, the plaintiff would be defaulted for failure to perform.
9. The defendant paid the plaintiff for the work the plaintiff had performed.
10. The plaintiff sued the defendant in Idaho claiming payment for extra work performed in Arizona due to the muddy conditions.
Professor Lewis of the University of Idaho College of Law has criticized the manner in which this Court applied the principles stated in Burger King to uphold the exercise of personal jurisdiction in Beco. Lewis, The Current Validity of Personal Jurisdiction Doctrine in Idaho, 25 Idaho L.Rev. 223 (1988-1989). However, Beco is controlling precedent in Idaho and the rule of stare decisis dictates that we follow it, unless it is manifestly wrong, unless it has proven over time to be unjust or unwise, or unless overruling it is necessary to vindicate plain, obvious principles of law and remedy continued injustice. Scott v. Gossett, 66 Idaho 329, 335, 158 P.2d 804, 807 (1945); Bethke v. Idaho Sav. & Loan Ass'n, 93 Idaho 410, 412-13, 462 P.2d 503, 505-06 (1969); Smith v. State, 93 Idaho 795, 801, 473 P.2d 937, 943 (1970); Salinas v. Vierstra, 107 Idaho 984, 990-91, 695 P.2d 369, 375-76 (1985); State v. Guzman, ___ Idaho ___, ___ P.2d ___, Supreme Court No. 1990-152, p. 10 (filed Nov. 19, 1990). We should not consider overruling a controlling precedent, if there are other grounds for disposing of an appeal.
Here, Johnson joins Professor Lewis in criticizing our decision in Beco, but argues that we are not required to overrule Beco in order to accept his position. Johnson asserts that there are significantly fewer contacts with Idaho in this case than there were in Beco and requests that we limit Beco strictly to its facts and not extend it to the facts in this case. In evaluating this contention, we must view the evidence in the light most favorable to HFI and construe the evidence contained in the affidavits liberally in favor of HFI. Intermountain Business Forms, 96 Idaho at 540, 531 P.2d at 1185. As noted above, this is the same standard this Court was bound to apply in Beco, although the rulings being appealed there were denials of a motion to dismiss construed as a motion for directed verdict, and a motion for judgment n.o.v.
In this light, we examine the facts asserted by Houghland on behalf of HFI in his affidavit opposing the motion to dismiss. Among those facts were the following:
1. HFI's principal place of business was in Idaho. Diamond Mine Ice was an operating subsidiary of HFI operating in Arizona.
2. Johnson offered his services to HFI to help HFI secure a loan.
3. Johnson gained statistical information concerning HFI from various banks in Idaho and visited HFI's Idaho properties to be able more fully to acquaint himself with the security that would be offered for the loan.
4. Financial statements concerning HFI from both Idaho and Arizona were given to Johnson.
5. Johnson represented that a loan could be secured to refinance obligations *984 that HFI had in both Idaho and Arizona.
6. Johnson stated that security would be taken on HFI's property in both Idaho and Arizona to secure the loan.
7. It was agreed that the loan that was to be obtained would be secured by the Idaho property and the Arizona property of HFI.
8. On December 10, 1987, Johnson wrote a letter to representatives of HFI in Idaho thanking them for showing him their ranch while he was in Idaho and telling them that he would be submitting their loan request as soon as he received the October 31, 1987 year end financial statement.
Initially, we must determine whether we can sufficiently distinguish these asserted facts, viewing them in the light most favorable to HFI and construing them liberally in favor of HFI, from those in Beco in order to reach a different result without the necessity of determining whether Beco is manifestly wrong, has proven over time to be unjust or unwise, or must be overruled in order to vindicate plain, obvious principles of law and continued injustice. In Beco, the Court concluded that there was evidence in the record that the defendant "deliberately reached out beyond Utah to negotiate with an Idaho corporation and executed a contract which established a relationship of some months" with the plaintiff. From this, the Court held that the guidelines of Burger King had been met. 114 Idaho at 708, 760 P.2d at 1122.
The most significant difference between the evidence in Beco and the facts asserted here by HFI is that in Beco the contract was negotiated between the plaintiff in Idaho and the defendant in Utah, while here the loan proposal was negotiated between Johnson in Utah and Houghland in Arizona. However, as the Court pointed out in Beco, "the Burger King court specifically rejected the notion that a contract alone establishes minimum contacts. Instead, the court emphasized that the dealings between the parties prior to, and following, the execution must be examined." Id. (citations omitted) (emphasis in original). This convinces us that the negotiation of the contract in Beco between the parties while they were in Idaho and Utah was not the crucial factor in the Court's decision to uphold an exercise of personal jurisdiction. Rather, it was only one of the circumstances the Court considered in determining whether the defendant purposefully directed its activities at an Idaho resident and whether the litigation arose out of or related to those activities.
Reviewing the trial court's denial of Johnson's motion to dismiss under the standard established in Intermountain Business Forms, we are unable to distinguish the facts asserted by HFI here from those in Beco sufficiently to conclude that the trial court improperly denied the motion under Beco. Viewing the asserted facts contained in Houghland's affidavit in the light most favorable to HFI and construing those facts liberally in favor of HFI, the minimum contacts of Johnson with Idaho prior to, and following the formation of, the agreement were no less significant than those of the defendant in Beco. The fact that the agreement in this case was not formed in Idaho is not determinative under Beco. It was purely fortuitous that Houghland, the president of HFI, was residing in Arizona at the time the agreement was reached. He was merely a representative of HFI, an Idaho corporation with which Johnson had already dealt in Idaho in preparation for the agreement. Under Beco, we cannot ignore Johnson's activities in Idaho, despite the fact that the agreement was not formed here. The obvious purpose of those activities was to conduct business with HFI. The agreement only formalized what Johnson had sought by his contacts with representatives of HFI and financial institutions in Idaho.
Having concluded that the facts asserted by HFI provided sufficient minimum contacts under Beco to support the denial of Johnson's motion to dismiss we turn to the question of whether the exercise of jurisdiction comports with fair play and substantial justice, as both Burger King and Beco direct. In resolving this issue in *985 Beco, the Court examined factors that are similar to those in this case:
In this case, a leading consideration is whether it would unduly burden [defendant] to litigate in Idaho Falls as opposed to Provo, Utah, the county seat of [defendant's] home office. Since the towns are approximately 200 miles apart, [defendant's] case is not compelling that trial in Idaho is unreasonable. There are trial venues within each state separated by greater distance... .
In addition, the forum state's interest in adjudicating the dispute is strong. Jurisdiction here is asserted under Idaho's long-arm statute through which the legislature intended to provide a forum for Idaho residents.
Thus, the trial court had an adequate basis upon which to assert jurisdiction over [defendant]... .
Id. 114 Idaho at 708-09, 760 P.2d at 1124-25 (emphasis in original).
Here, the geography is very similar to that in Beco. The case was filed in Pocatello. The county seat of Johnson's home is Salt Lake City, Utah. The other factors affecting fair play and substantial justice do not weigh more heavily against the exercise of jurisdiction by Idaho in this case than in Beco.
Therefore, we conclude that if Beco is not overruled, we must affirm the ruling of the trial court denying Johnson's motion to dismiss.

III.

BECO OVERRULED.
Citing Professor Lewis' article in the Idaho Law Review noted above, Johnson suggests that we should closely examine the validity of Beco as continuing precedent. Our examination of Beco causes us to conclude that it was manifestly wrong and should be overruled to the extent that it conflicts with Burger King.
What is really at issue in considering whether Beco should be overruled is whether the exercise of the specific personal jurisdiction that it permits violates the standards the United States Supreme Court articulated in Burger King. Professor Lewis succinctly states the error he sees in Beco:
Put simply, the Beco majority seems to have stretched Burger King to fit the facts of Beco by ignoring a multitude of forum-focused contacts found significant in Burger King but missing in Beco, and by finding "defendant-initiated contacts" with Idaho whenever the defendant engaged in communications with an Idaho resident who happened to be at home. In short, Beco imposed a jurisdictional caveat emptor for those who deal with Idaho parties in foreign business transactions. That position may stand alone among courts considering similar questions, and has been rejected by commentators. In light of Burger King's rejection of the forum residence of a contracting party as a sufficient basis for jurisdiction, Beco appears to be wrongly decided.
25 Idaho L.Rev. at 268-69.
There are clearly distinctions between the jurisdictional facts in Burger King and those in Beco. In Burger King, the Supreme Court focused on the fact that the defendant, who resided in Michigan, had "negotiated with a Florida corporation for the purchase of a long-term franchise and the manifold benefits that would derive from affiliation with a nationwide organization." 471 U.S. at 479-80, 105 S.Ct. at 2186, 85 L.Ed.2d at 545. The Court also stressed that the defendant's "refusal to make the contractually required payments in Miami, and his continued use of Burger King's trademark and confidential business information after his termination, caused foreseeable injuries to the corporation in Florida." Id. at 480, 105 S.Ct. at 2186, 85 L.Ed.2d at 546. The Court pointed out that the fact that the contract stated that it would be deemed to be made and entered into in Florida and would be governed and construed under the laws of Florida "reinforced [the defendant's] affiliation with the forum State and the reasonable foreseeability of possible litigation there." Id. at 482, 105 S.Ct. at 2187, 85 L.Ed.2d at 547. In conclusion, the Court said:

*986 Because [the defendant] established a substantial and continuing relationship with Burger King's Miami headquarters, received fair notice from the contract documents and the course of dealing that he might be subject to suit in Florida, and has failed to demonstrate how jurisdiction in that forum would otherwise be fundamentally unfair, we conclude that the District Court's exercise of jurisdiction ... did not offend due process.
Id. at 487, 105 S.Ct. at 2190, 85 L.Ed.2d at 550.
The essence of the standard applied by the Supreme Court in Burger King is whether the defendant has "purposefully directed" its activities at residents of the forum and whether the litigation results from the alleged injuries that arose out of or relate to those activities. Id. at 472, 105 S.Ct. at 2182, 85 L.Ed.2d at 540. The Court focused on "`the foreseeability ... that the defendant's conduct and connection with the forum State are such that [the defendant] should reasonably anticipate being haled into court there.'" Id. at 474, 105 S.Ct. at 2183, 85 L.Ed.2d at 542 (citation omitted). In interstate contract cases, the Court noted that it had emphasized the "parties who `reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions in the other State for the consequences of their activities." Id. at 473, 105 S.Ct. at 2182, 85 L.Ed.2d at 541 (citations omitted). Although we repeated these standards in Beco, 114 Idaho at 707, 760 P.2d at 1123, the exercise of jurisdiction there went well beyond that approved in Burger King.
In Beco, this Court held that the defendant "deliberately reached out beyond Utah to negotiate with an Idaho corporation and executed a contract which established a relationship of some months" with the plaintiff. Id. at 708, 760 P.2d at 1124. We stated that we were satisfied that the guidelines of Burger King were met, because we found "repeated defendant-initiated contacts." Id. This was not consistent with the analysis of the United States Supreme Court in Burger King. There, the Supreme Court noted:
In defining when it is that a potential defendant should "reasonably anticipate" out-of-state litigation, the Court frequently has drawn from the reasoning of Hanson v. Denckla, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239-1240, 2 L.Ed.2d 1283 (1958):
"... [I]t is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."
471 U.S. at 474-75, 105 S.Ct. at 2183, 85 L.Ed.2d at 542. There is no evidence in Beco that the plaintiff purposefully availed itself of the privilege of conducting activities in Idaho, as the Court in Burger King delineated the deciding considerations in upholding the assertions of specific personal jurisdiction there.
This Court acknowledged in Beco that the relationship between the plaintiff and the defendant there "was not as enduring nor as complex" as that of the parties in Burger King, but noted that "it was certainly more involved than that which obtained in McGee v. International Life, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957) (a single, mailed life insurance renewal letter), cited repeatedly in Burger King." 114 Idaho at 708, 760 P.2d at 1124. However, in Burger King the Court specifically limited the significance of McGee:
So long as it creates a "substantial connection" with the forum, even a single act can support jurisdiction. McGee v. International Life Insurance Co., 355 U.S., at 223, 78 S.Ct., at 201. The Court has noted, however, that "some single or occasional acts" related to the forum may not be sufficient to establish jurisdiction if "their nature and quality and the circumstances of their commission" create only an "attenuated" affiliation with the forum. International Shoe Co. v. Washington, 326 U.S. 310, 318, 66 S.Ct. 154, 159, 90 L.Ed. 95 (1945); World-Wide Volkswagen Corp. v. Woodson, 444 U.S. [286], at 299, 100 S.Ct. [559] at 568 [62 L.Ed.2d 490 (1980)]. This distinction derives from *987 the belief that, with respect to this category of "isolated" acts, id., at 297, 100 S.Ct., at 567, the reasonable foreseeability of litigation in the forum is substantially diminished.
471 U.S. n. 18 at 475-76, 105 S.Ct. n. 18 at 2184, 85 L.Ed.2d n. 18 at 543.
McGee involved a lawsuit a California resident brought in California against a Texas insurance company. In upholding the exercise of personal jurisdiction by the California court against the insurance company based on service of process in Texas, the Supreme Court listed the important facts and circumstances it considered:
The contract was delivered in California, the premiums were mailed from there and the insured was a resident of that State when he died. It cannot be denied that California has a manifest interest in providing effective means of redress for its residents when their insurers refuse to pay claims. These residents would be at a severe disadvantage if they were forced to follow the insurance company to a distant State in order to hold it legally accountable. When claims were small or moderate individual claimants frequently could not afford the cost of bringing an action in a foreign forum  thus in effect making the company judgment proof. Often the crucial witnesses  as here on the company's defense of suicide  will be found in the insured's locality.
355 U.S. at 223, 78 S.Ct. at 201, 2 L.Ed.2d at 226.
As we see it now, the Court overread the significance of McGee in reaching its decision in Beco. The expansion of specific personal jurisdiction to accommodate the facts in Beco went beyond not only the standard established in Burger King, but also beyond the rationale of McGee. To this extent, we now overrule Beco because it was manifestly wrong.

IV.

APPLYING BURGER KING, THE TRIAL COURT SHOULD HAVE GRANTED THE MOTION TO DISMISS.
Applying Burger King to the facts asserted here, even viewed in light of the "evidentiary presumptions" established in Intermountain Business Forms, we conclude that Johnson's motion to dismiss should have been granted. In reaching this conclusion, we review the significance of each of the facts asserted in Houghland's affidavit in opposition to Johnson's motion to dismiss, in the light most favorable to HFI and giving HFI the benefit of all inferences that may reasonably be drawn from them.
The fact that HFI's principal place of business was in Idaho has no significance in determining whether Idaho may exercise personal jurisdiction over Johnson. It is Johnson's activities, not HFI's location that must be considered.
The fact that Johnson offered his services to HFI to help HFI secure a loan is significant under Burger King only to the extent that Johnson pursued this offer by purposefully availing himself of the privilege of conducting activities within Idaho, thus invoking the benefits and protections of our laws. There is no evidence that Johnson did so.
According to Houghland's affidavit, Johnson gained statistical information concerning HFI from various banks in Idaho and visited HFI's Idaho properties to be able more fully to acquaint himself with the security that would be offered for the loan. The acquisition of statistical information concerning HFI has no significance in determining whether Johnson invoked the benefits and protections of the laws of Idaho, which is the ultimate test applied in Burger King.
The fact that Johnson visited HFI's Idaho properties to be able more fully to acquaint himself with the security that would be offered for the loan does not justify the exercise of jurisdiction over Johnson. Mere personal presence in Idaho at one time is not sufficient in and of itself to form the basis for the exercise of specific personal jurisdiction over a person who is later served with process outside the state. In Burger King, the Court said that "territorial presence frequently will enhance a *988 potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there... ." 471 U.S. at 476, 105 S.Ct. at 2184, 85 L.Ed.2d at 543. Here, there were not sufficient other activities of Johnson in Idaho to be enhanced by this one isolated event.
Houghland also asserted that Johnson received financial statements concerning HFI from both Idaho and Arizona, represented that a loan could be secured to refinance obligations that HFI had in both Idaho and Arizona, stated that security would be taken on HFI's property in both Idaho and Arizona to secure the loan, and alleged that it was agreed that the loan that was to be obtained would be secured by the Idaho property and the Arizona property of HFI.
If the loan proposal had in fact proposed to secure the loan with property in Idaho, that would have presented a different case for us to consider. However, the loan proposal proposed to secure the loan only with the assets of Diamond Mine Ice in Arizona. It is this loan proposal that forms the basis for this lawsuit. Considering the attempted exercise of specific personal jurisdiction in the context of this agreement, whether the parties might have agreed to obtain a loan using the Idaho property of HFI as security is irrelevant.
The fact that Johnson wrote a letter to representatives of HFI on December 10, 1987, thanking them for showing him their ranch while he was in Idaho and telling them that he would be submitting their loan request as soon as he received the October 31, 1987 year end financial statement does not add any additional support to the exercise of personal jurisdiction over Johnson. It was merely an isolated circumstance and did not indicate that Johnson had invoked the benefits and protections of our laws.
The fact that the assets of Diamond Mine Ice that were the proposed collateral in the loan proposal of December 14, 1987, were located in Arizona militates against the exercise of personal jurisdiction by Idaho.
We conclude that Johnson did not purposefully avail himself of the privilege of conducting activities within Idaho, thus invoking the benefits and protections of its laws, as required by Burger King.

V.

CONCLUSION.
We reverse the trial court's denial of Johnson's motion to dismiss. Because of our ruling on the motion to dismiss, we find it unnecessary to address the appeal of the order granting summary judgment to HFI. We remand the case to the trial court with directions to vacate the judgment and to dismiss the action.
We award costs but no attorney fees on appeal to Johnson.
BAKES, C.J., and BOYLE and McDEVITT, JJ., concur.
BISTLINE, Justice, specially concurring.
The rule of stare decisis requires "`that a question once deliberately examined and decided should be considered as settled... unless it is demonstrably made to appear that the construction manifestly is wrong.'" Scott v. Gossett, 66 Idaho 329, 335, 158 P.2d 804, 807 (1945) (quoting State ex rel. Kain v. Fischl, 94 Mont. 92, 97, 20 P.2d 1057, 1059 (1933). Justice Johnson recently wrote in his dissent in State v. Guzman, Dkt. 17716, Idaho (1990):
From these `precedents' we can glean that prior decisions of this Court should govern unless they are manifestly wrong or have proven over time to be unjust or unwise. While I am prepared to accept these limitations on the rule of stare decisis, I am not prepared to allow these limitations to convert the precedents of this Court into ephemeral edicts that are here today and gone tomorrow, the duration of their life-span depending on the composition and disposition of the Court.
While an argument can be made that Beco Corp. v. Roberts & Sons Const. Co., 114 Idaho 704, 760 P.2d 1120 (1988) may have gone beyond Burger King Corp. v. *989 Rudzewicz, 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) and McGee v. International Life, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957) (a single life insurance renewal letter mailed into California was a sufficient basis for California's jurisdiction), I am not entirely persuaded by the majority's showing that Beco was manifestly wrong. It seems instead that the Beco precedent is to be one of those ephemeral edicts described by Justice Johnson in Guzman that is here today, gone tomorrow, the result of a change in the composition of the court. Indeed, the holding in the Beco majority opinion was reached by Chief Justice Shepard, Justice Huntley and myself, with only Justice Bakes dissenting (Justice Donaldson sat but did not participate due to his untimely death). Of that threesome I alone remain to speak for the Beco majority. Without the presence of Justices Shepard and Huntley, rather than attempt the defense of the Beco decision we will let it speak for itself. No question is raised to today's Houghland opinion for the Court, or to the overruling of Beco. Many "long arm" applications are close calls; Beco was one of those, and what was said in Guzman is here equally applicable:
This Court does not have in mind the demise of the doctrine of stare decisis, a satisfactory definition of which is readily available:
Doctrine is one of policy, grounded on theory that security and certainty require that accepted and established legal principle, under which rights may accrue, be recognized and followed, though later found to be not legally sound, but whether previous holding of court shall be adhered to, modified, or overruled is within court's discretion under circumstances of case before it. Under doctrine, when point of law has been settled by decision, it forms precedent which is not afterwards to be departed from, and, while it should ordinarily be strictly adhered to, there are occasions when departure is rendered necessary to vindicate plain, obvious principles of law and remedy continued injustice. The doctrine is not ordinarily departed from where decision is of long-standing and rights have been acquired under it, unless considerations of public policy demand it.

Black's Law Dictionary, 1406 (6th ed. 1990) (citations omitted).
State v. Guzman, at ___.
With four members of the Court being of the belief that we are presented with an "occasion when departure is rendered necessary to vindicate plain, obvious principles of law and continued injustice," I do not disagree, and join Justice Johnson's opinion. In doing so, I adhere to the belief expressed in State v. Guzman that when this Court discovers that it has visited upon the trial bench and bar an opinion which is not founded upon sound principles and analysis, then it is far better that its invalidity be acknowledged early on, rather than down the pike ten, twenty, or fifty years.[1]
NOTES
[1] Recollection brings to mind a number of opinions which were strong candidates for reconsideration and probable extinction.